Howard Sole, Inc. v. Commissioner.
Howard Sole, Inc. v. Commissioner
Docket No. 34082.
United States Tax Court
1953 Tax Ct. Memo LEXIS 346; 12 T.C.M. (CCH) 238; T.C.M. (RIA) 53076; March 9, 1953
*346 Deduction: Compensation: Section 23 (a) (1) (A). - Petitioner's board of directors voted its principal officer a fixed salary plus a bonus based on a percentage of corporate earnings. The board of directors was composed of two directors, each representing families owning one-half of the issued stock. One of the directors was the principal officer who received the salary; the other director was not related to the principal officer and took no active part in the operation of the business. The inactive director was in the automobile finance business and was familiar with salaries paid to automobile distributors. Held, the compensation paid to the officer was a reasonable allowance for personal services rendered. Robert J. Bannister, Esq., 1012 Bankers Trust Building, Des Moines, Ia., and James E. Cooney, Esq., for the *347 petitioner. Everett E. Smith, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner determined a deficiency of $10,998.61 in the income tax of the petitioner for 1946. The issue for decision is whether the Commissioner erred in holding that a reasonable allowance for 1946 as compensation for personal services rendered to the petitioner by Howard Sole, as its president was only $20,000 of the $48,943.70 claimed on the return. Findings of Fact The corporation income tax return of the petitioner for 1946 was filed with the collector of internal revenue for the district of Iowa. The petitioner was organized and incorporated under the laws of the State of Iowa, on September 24, 1936, for the purpose of taking over the franchise for the sale and servicing of new Buick automobiles and used automobiles in Des Moines, Iowa, and surrounding territory. The authorized capitalization consisted of 400 shares of common stock having a par value of $100 each, totaling $40,000. Of this authorized stock, $25,000 was subscribed and paid for in cash at the inception of the business. The capital investment has remained the same up *348 to and including the taxable year. Howard Sole, hereinafter referred to as Sole, and his wife owned $12,500 of the stock and the Chase family owned $12,500 of the outstanding stock. The stock has always been equally divided between the two families. Howard Sole is not related to the Chase family. All dealings between Sole and the Chase family have been arm's length business transactions. Sole, who was 59 in 1952, began his automobile career in 1914 in Detroit, Michigan, with the Chalmers Motor Company as a motor-test man in its factory. In 1916 he was transferred to Minneapolis as road mechanic for Chalmers Motor Company and later went with a Chalmers dealer as parts department manager. He accepted a similar position with the Mackie Motor Company, a Chalmers dealer, in Des Moines, Iowa, in 1917 and served with two or three other dealers through 1920. Later, in 1920, he became service manager and shop foreman for the Manbeck Motor Company of Des Moines, Iowa, and in 1921 handled its used car sales department. In 1921 he started his own used car business under the name of Sole's Auto Exchange and continued this business until petitioner was organized in 1936. In 1935 Sole was offered *349 the Buick Motor Company Agency in Des Moines. He needed additional capital to handle the agency and considered three alternatives in financing the agency. One was the Motors Holding Company, a division of General Motors Corporation which helped individuals acquire dealer franchises. Another was a local finance company. And the third was Givan Chase of the Chase Investment Company. Sole had dealings with Chase Investment Company when he was an individual proprietor as Chase Investment Company had financed the cars he had sold. Sole, together with the Chase family, acquired the Buick franchise, each of them putting up one-half of the invested capital. At the first meeting of petitioner's board of directors on January 8, 1937, it was resolved that Sole was to receive a salary of $350 per month plus a bonus based upon the net profits of petitioner before income taxes as follows: Bonus
First $5,000 of net profits
None
Next $5,000 of net profits
20 per cent
Above $10,000 of net profits
33 1/3 per cent This resolution was unanimously approved by the board of directors which consisted of Sole and Hal S. Chase II. Hal S. Chase II had been in the auto finance business *350 since 1935. He knew the salaries paid in other dealerships as he had seen other dealers' records. These two men represented the two equally owned interests of the business. The following year, January 14, 1938, Sole's salary increased to $450 per month and the bonus arrangement was continued by the board of directors. On March 29, 1940, Sole's salary was increased to $550 per month and the bonus arrangement was continued by the board of directors. On January 9, 1942, Sole's salary and bonus were continued by the board of directors for 1942. At the beginning of 1943, 1944 and 1945 the salary and bonus paid to Sole in 1942 were approved by the board of directors. On January 11, 1946, the board of directors increased Sole's salary to $650 per month for the year 1946 and continued the bonus which had prevailed since January 8, 1937. The board of directors had also approved each year a salary of $100 per month to Hal S. Chase II as secretary of petitioner. Bonus and salaries were paid each year pursuant to these resolutions. Sole has been the chief executive officer of petitioner since it was organized. He has devoted all of his time to this business and has had no other occupation since *351 1937. He has been president of the Iowa Automobile Dealers Association, the Des Moines Dealers Association and the State Highway Automobile Dealers Association. He is the only Buick dealer in Des Moines and the largest Buick dealer in Iowa. Petitioner's net sales, Howard Sole's compensation and the net profit of petitioner before income taxes were as follows: Net Profit
Before
Sole's Com-
Income
Year
Net Sales [1]
pensation
Taxes
1941
$1,183,530.27
$18,189.72
$30,182.63
1942
328,659.22 [2]
13,773.76
21,347.51
1943
269,235.52 [2]
13,711.71
21,223.42
1944
208,495.66
10,937.02
15,674.03
1945
228,911.83
12,680.37
19,160.74
1946
735,155.17
48,943.70
89,287.41
New & Used
Service
Total
1942
$272,703.16
$ 56,106.06
$328,809.22 [2]
1943
232,002.53
56,392.99
288,395.52 [2]
1944
145,785.89
62,709.77
208,495.66
1945
155,087.41
73,824.42
228,911.83
1946
Sales
Cost of Sales
Gross Profit
New & Used
Service
613,352.21
451,877.17
161,475.04
121,802.96
64,099.19
57,703.77
$735,155.17
$515,976.36
$219,178.81
*352 Sole's compensation for 1946
was computed as follows: Net profit before deducting
Sole's compensation and Fed-
eral and State income taxes
$138,231.11
Less Sole's salary ( $650 per
mo. x 12)
7,800.00
$130,431.11
Sole's salary
$ 7,800.00
Computation of bonus: First $5,000
Second $5,000 at 20
per cent $1,000.00
Balance $120,431.11 at
33 1/3 per cent 40,143.70
Total bonus
41,143.70
Total compensation
$ 48,943.70
Since Sole took over the Buick agency, he has more than doubled the sale of Buick automobiles in Polk County, where Des Moines is located, and in one year he tripled the previous dealer's 1936 sales. During the year 1946 most of the cars were sold by Sole as he did not have too many salesmen. The original investment of $25,000 by the stockholders had increased to a net worth of $109,449.31 at the end of the taxable year even after petitioner had declared dividends to its stockholders as follows: Year
Per Share
Total Dividend
1937
$55.52
$13,878.76
1938
38.00
9,500.00
1939
Dividend passed
1940
40.00
10,000.00
1941
25.00
6,250.00
1942
50.00
12,500.00
1943
25.00
6,250.00
1944
25.00
6,250.00
1945
25.00
6,250.00
1946
50.00
12,500.00
Total Dividends
$83,378.76
*353 The dividends paid represent a return of 333 per cent on the stockholders' original investment of $25,000 for the 10 years' operation. Petitioner's net worth on January 1, 1946, was $68,203.05 and was $108,449.31 on December 31, 1946, an increase of $40,246.26. Manbeck Motor Sales Company, one of two Chrysler dealers and one of four Plymouth dealers in Des Moines, Iowa, had the following sales, cost of sales and gross profit in 1946: Cost of
Gross
Sales
Sales
Profit
New cars
$435,169.25
$342,830.32
$ 92,338.93
Used cars
129,971.16
110,927.43
19,043.73
Total
$565,140.41
$453,757.75
$111,382.66
Service Dept.
182,669.43
72,762.74
109,906.69
Total
$747,809.84
$526,510.49
$221,289.35
Amount put
in surplus
during 1946
$21,175.03 The president of Manbeck Motor Sales Company was Earl Manbeck, who owned one-half of the stock of the company. The other half of the stock of the company was owned by Earl's brother, Roland Manbeck. Roland was vice-president-secretary; his duties are not disclosed by the record but he devoted all his time to Manbeck Motors. Earl was president and treasurer, devoting full time to Manbeck Motors. He *354 supervised sales, service sales, parts and financing used car sales. Earl has been in the automobile business since 1911. Each of the brothers received a salary of $10,400. This was their total compensation. Earl Manbeck stated he was satisfied with his compensation. Manbeck Motors had eight salesmen in addition to Earl and Roland in 1946. A reasonable salary allowance for Howard Sole during the year in controversy was $48,943.70. Opinion The petitioner has claimed a deduction of $48,943.70 under section 23 (a) (1) (A) of the Internal Revenue Code which permits a deduction "including a reasonable allowance for salaries or other compensation for personal services actually rendered." The Commissioner's deficiency notice stated: "It is held that compensation paid your president, treasurer, and general manager, Mr. Howard Sole, exceeded a reasonable allowance for personal services actually rendered to the extent of $28,943.70 for the year ended December 31, 1946. Deduction claimed in the amount of $48,943.70 is, therefore, disallowed in the amount of $28,943.70 for such year." The compensation in question consisted on a basic salary of $650 per month plus *355 a portion of net profits, zero on first $5,000, 20 per cent on next $5,000 and 33 1/3 per cent on all above $10,000, totaling $48,943.70. Petitioner contends that the employment contract was an arm's length transaction; that it provided for a contingent compensation pursuant to free bargaining between the employer and the individual made before the services were rendered; and that it should be allowed even though in the actual working out of the contract it may have proven greater than the amount which ordinarily would have been allowed. Respondent, on the other hand, contends that a comparable concern in Des Moines paid its corresponding officer half as much as respondent allowed the petitioner to deduct; that in 1941 petitioner had a higher sales volume than in 1946 and paid Sole a lesser compensation; that the higher sales of 1946 were attributable to a seller's market rather than extraordinary services on the part of the petitioner's president and that there is insufficient evidence that Sole's services were worth $48,943.70 in 1946. Provision for contingent compensation is found in respondent's Regulations 111, section 29.23 (a)- 6 (2) and (3): "Sec. 29.23 (a)- 6 (2). The *356 form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. "(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing *357 at the date when the contract for services was made, not those existing at the date when the contract is questioned." Two of petitioner's witnesses testified as to the reasonableness of a bonus paid to a dealer operating under the Motors Holding Plan of General Motors as substantiating the reasonableness of the bonus paid under the present contract. The Motors Holding Plan applies to persons attempting to acquire a General Motors franchise. University Chevrolet Co., 16 T.C. 1452. We find this testimony to be completely irrelevant to the petitioner because Sole was not attempting to acquire ownership of the business in the year involved. Sole had rejected the plan in favor of investing in one-half of the stock of petitioner. Of definite significance is the testimony of Hal S. Chase II. Chase had been in the automobile finance business in Des Moines since 1935. He, together with his family, knew Sole and was familiar with his past experience and owned one-half of the business. Sole was not related in any way to the Chase family and we find that the parties have dealt at arm's length in all business transactions. Chase was familiar with the compensation paid to other dealers *358 in the automobile distributing agencies in Des Moines as he had seen their records. Undoubtedly this knowledge was used in arriving at a salary and bonus forsole. The Chase family had invested in the petitioner and were interested in protecting their investment and getting a good return on their capital. They realized that Sole was an efficient, well-rounded automobile executive and wanted to provide him with some incentive in addition to his regular salary. Sole would not only increase his salary by increased sales but would benefit the stockholders by providing increased surplus for distribution. The maximum he could possibly get over and above his fixed salary would be one-third of net profits in excess of $10,000. The record does not disclose any ground for doubting the bona fides of the employment resolution. The parties entered into the arrangement 10 years prior to the year in question and the arrangement was decided upon prior to the year's business when neither party knew what the year's profits would total. Thomas N. Perkins, 33 B.T.A. 606. uin Austin v. United States, 28 Fed. (2d) 677, the court said: "It is immaterial that in the actual working *359 out of the contract contingent compensation may prove to be greater than the amount which ordinarily would be paid." Respondent has not convinced us that there is any basis on which to question the business acumen of Chase, who was familiar with the compensation paid to other automobile distributors and agreed to the salary and bonus paid Sole. The stockholders' rights have not been overlooked in this case as dividends have been paid yearly and the total dividends for 10 years represent a return of 333 per cent on the original investment. Respondent places great weight on the $10,400 salary paid to Earl Manbeck of Manbeck Motors as petitioner and Manbeck Motors had about the same gross sales in 1946. Respondent contends he has been liberal in allowing petitioner to deduct an amount representing compensation paid to Sole which is twice the amount of the salary of Manbeck. The two men are hardly comparable. Sole was the only active officer of petitioner while Manbeck Motors had two officers to assume the responsibilities. Manbeck Motors also had eight salesmen to make the sales while petitioner's sales were made primarily by Sole. Since Manbeck Motors was owned by two brothers, little *360 purpose would be served in voting incentive bonuses to themselves. As we said in University Chevrolet Co., supra, 1455: "For the sole owner to pay himself a bonus as an incentive to do his best in managing his own business is nonsense." It is difficult for us to determine readily whether petitioner and Manbeck Motors are comparable automobile distributors. No showing is made as to whether or not Manbeck Motors' net profit was computed after or before deduction of officers' salaries and income taxes. Undoubtedly, Manbeck Motors had to pay the eight salesmen commission on sales they made which reduced its net profit. We note that the amount transferred to surplus by that company was $21,175.03 while petitioner's surplus increased $40,246.26. It stands to reason that Sole, having conducted a one-man show resulting in twice the increase in surplus as Manbeck Motors even after deducting double the salary, can hardly be limited to the salary paid Manbeck. We do not agree with respondent that the salary paid to Manbeck is a basis for compensating Sole. Respondent further calls our attention to the fact that sales in 1941 were higher than in 1946 yet Sole's salary was higher *361 in 1946 than 1941. Gross sales are not the only criteria for determining an officer's salary. The net profits must be considered. A person who is able to sell less automobiles and brings a higher net profit is entitled to a higher salary than one who has higher gross sales and a lower net profit. The ability to keep down overhead and operating expenses is a business asset which should be compensated. Respondent contends the seller's market was the cause of the increased profit to petitioner, not the services rendered by Sole. While it is true this factor was a powerful influence, the ability of Sole to adjust his organization to the increase in sales volume and his ability to take care of new customers virtually unaided should in all reasonableness be compensated by an increase in salary and bonus. Lastly, respondent states there is insufficient evidence that petitioner's services were worth $48,943.70. The record shows Sole's qualities as a successful, proficient, ambitious distributor devoting his full time to petitioner's operations. He knew the automobile distributorship business from the ground up, having been active in all phases of it for 32 years. No beneficial purpose *362 would be accomplished in distinguishing the cases cited by respondent as this issue is a factual one, Mayson Mfg. Co. v. Commissioner, 178 Fed. (2d) 115, and each case must be decided on its particular merits. On the basis of the evidence as a whole, we conclude that the salary and bonus paid to Sole should be allowed as a deduction. Decision will be entered for the petitioner. Footnotes
1. Breakdown of Sales Differences not explained.
[2]↩ Differences not explained.